We're now ready to hear 23-1307, Curtis Park Group v. Allied World Specialty Insurance Company. Mr. Yarger. Thank you, Judge Arts. It may please the Court, Fred Yarger on behalf of the appellant, Allied World Specialty Insurance Company. Curtis Park purchased a builder's risk policy to cover its own losses only. It did not purchase or pay premiums for the losses of anybody else, including Milliner White or its subcontractors. Although the policy is expressly limited to covering only the losses of the name insured, the District Court instructed the jury, quote, does not preclude Curtis Park from seeking coverage under the policy. You must treat these facts as true. That was a significant legal error that requires reversal for three reasons. First, the language of the policy is very clear and says that only the losses of the name insured are covered and case law confirms that name insured provisions are important and those who are not listed as name insureds in builder's risk policies are not covered for the losses. Second, Curtis Park never paid the hard costs and will never have to pay them. Instead, Curtis Park sent a formal notice to Milliner White under the party's contract requiring Miller White to, quote, fix all deficiencies and cover all associated costs. And that's exactly what Milliner White and its subcontractors did. Finally, a complete retrial required not a partial remand, as Curtis Park is asking this court, because the court's errors alone in instructing the jury, excluding evidence, and misconstruing the policy fundamentally affected the presentation of the case. And we cannot be certain that the outcome would not change had the jury been properly instructed. Outcome on what? On the original exclusion? On the entire case. And probably the best example of this, but not the only example of this, is Allied World had a misrepresentation defense about the hard costs. That defense is not just a defense to parts of damages or claims, it's a defense to the entire case, coverage, soft costs, hard costs, and the bad faith claims. So had that defense been submitted to the jury, there certainly could have been a very different outcome. It could have been a complete defense of hereditary. Did Curtis Park represent that it had in fact paid the losses? It did do so. It did so in a sworn proof of claim submitted to the insurance company during the claim adjustment process. And with the claim narrative there, and was this just a mistake? The claim narrative, Curtis Park lists the general contractor as an additional insurer. That's false. And what's the explanation for that? Was there a misunderstanding of whether that was so? I can't climb into the mind of Curtis Park and Millinder White. Okay, but it's stipulated now. Well, their argument is not that Millinder White is an insurer in the policy, as an additional insurer or something else. Their argument is that the definition of losses in the policy is so broad that it covers not just Curtis Park as named, but Millinder White and also the subcontractors and the subcontractor of one of the subcontractors. So their argument is not that Millinder White is named. And I don't think they make that claim here or that representation in the brief. What if Curtis Park had just written a check for the hard losses, even though it might have well had a right to an action against the general contractor and perhaps even the subcontractors? At that point, would Allied be responsible? That would have, well, I wouldn't say Allied would be responsible because we have defense and other defenses to coverage. That would have made a world of difference because then Curtis Park would have been actually out of pocket for the repair costs. And that's what the policy requires. It says that we will not pay, payment will not exceed the amount that you, defined as Curtis Park, spend or repair or replace the damaged property. And of course, they said if we had paid an invoice, this case would be different. We've agreed with that. They didn't pay an invoice. Not only did they not pay an invoice, there was no invoice ever even issued. Instead, there was a formal notice letter from Curtis Park to Millender-White saying, quote, I think it's important to quote exactly what this notice said. We are requiring you to, quote, fix all deficiencies and cover all associated costs, which is exactly what Millender-White and its subcontractors did. And there's really no dispute about that. The evidence of trial was uniform and the statements of counsel was uniform. Perhaps the best evidence of this was the statement of Curtis Park's own corporate representative, Jonathan Alpert. And I think it's worth understanding exactly what he testified to in his deposition testimony. Question, do you know whether or not Curtis Park has paid to Millender-White any of this $2.8 million? Answer, we have not. Question, if the insurance company is successful in its defense of this claim, you would in turn not owe any money to Millender-White? Answer, no, we will not pay Millender-White. There is no coverage for those losses. There's coverage for Curtis Park's costs that it actually incurred, that it actually spent. So is the closeout agreement just essentially an agreement by Curtis Park to share its insurance with Millender? If it is, that's completely void because you can't expand coverage of a policy through a third party. Understood. But is that what's really going on? Is that a fair characterization? I think what a fair agreement in itself says what's going on. Quote, cooperation in the joint prosecution of the insurance plan. It's an agreement to fund litigation against the insurance company. It doesn't say anything about an invoice because there was no invoice issue. It says nothing at all about repair on credit because there was no repair on credit agreement. And by the way, those are brand new arguments. Curtis Park below never said a word to the judge or anybody else that there was a repair on credit agreement or that there was a valid debt for the cost of these repairs because there isn't any valid debt. There was a situation where Millender-White fixed this slab, forced its subcontractors to fix this slab, went to the subcontractors and told them, we're not paying you either. We're not paying you to die. And in fact, in this closeout agreement, it says that Millender-White will indemnify and hold harmless Curtis Park against any claims the subcontractors may have. So the closeout agreement wasn't just not an invoice debt. It was a guarantee that Curtis Park wouldn't owe anything about the cost. It was an agreement to share the cost of litigation and share in the upsides of litigation. That is not a valid debt of an invoice, Your Honor. Did Millender-White have to make any payments with respect to the hard costs or was that extra work paid for by the subs of Millender-White? As I understand it, it was a combination of two. Millender-White did go out of pocket on its own for portions of the hard costs, but it also pushed those costs down to its two subcontractors, All Things and Harris-Rebar. It told them, we're not paying you. In fact, not only are we not paying you on this job, we're withholding amounts of money that we would otherwise pay you on completely unrelated construction projects that Allied World had absolutely nothing to do with. So did Millender-White incur any additional costs from the reworking of the structure? Again, I think a portion of those hard costs. Some portion of it. When you started your argument, you were saying you were asking for a full trial of everything. Yes, sir. How would this issue that you're raising here affect the soft costs? Yes. So in at least two ways, Your Honor. First of all, again, we had a misrepresentation defense that said to Curtis Park, you told us that you had coverage for these hard costs. You never told us that Millender-White and his subcontractors, in fact, paid those costs. That's a material misrepresentation under the policy. That is a complete defense. It's not just a defense to one part of the claim. It's a complete defense to the entire case. The coverage claim... And how did the district court deal with that defense? At the pretrial conference, the district court said, I don't find there to be a misrepresentation because it doesn't matter in any one of them. Okay. He quotes his quote, I do not believe it matters that Millender-White did the repair on their own and have agreed to waive costs. That's volume 6 of the appendix 192, and it goes on from there to talk about misrepresentation. And the bad faith claim obviously would be affected. It would be, yes. Were there any other claims? There were really two claims in the case, Your Honor, coverage and bad faith. There were subparts of those claims about different coverage provisions in the agreement. But the basic sort of contours of the case was a coverage claim for soft costs and hard costs and a bad faith claim. The misrepresentation defense was a defense to the whole thing. And are you seeking a retrial on the bad faith and hard costs also? No. We're asking this court, just as it did in Boardwalk, to correctly construe the policy, instruct the court that it has to retry the case but without any hard costs involved because it's... Okay. And what about bad faith? Yes. We're seeking a retrial on bad faith to the extent they can still pursue it. I think they would still argue that there is a bad faith claim that underlies the soft costs. They simply get to retry that. Because the delay occurred before the agreement or what? Why does that survive? Their assertion on bad faith was essentially that the claim investigation took too long. Which was over a year. It was. It was a significant period of time. And I can go into many reasons why it took that long. Let's not. Let's not. The bottom line is the jury heard a lot of evidence on that issue. And my liberal deserves a retrial because one... This is the other issue with retrial. It's not just a misrepresentation defense. Immediately after, my trial team adduced evidence from Millinger White, or excuse me, from Curtis Park, that Curtis Park didn't actually pay for these losses. The judge took a break, admonished my co-counsel, came out of the break and told the jury immediately, it doesn't matter. I'm telling you as the jury that they can agree together, outside the court, and then come in here and seek benefits and it doesn't matter. That cast my client in a very awkward light. It basically told the jury, the arguments that Allied World is making about coverage are a waste of your time and are incorrect and you should disregard them. That had a fundamental effect on the jury's presentation. Also, just like in the Boardwalk case, this case presents an odd situation. Typically, you'd expect the building owner to be arguing that their contractor made a mistake and that they owe money for it. Here, oddly enough, because of the CLOSAD agreement and the agreement to fund this litigation, they were, quote, rowing the boat together. So the owner of the project was claiming that he didn't know what happened. The contractor was claiming that they didn't know what happened, even though they'd agreed to pay all costs and waive all expenses. So it presented a very skewed picture to the jury where we weren't allowed to tell them, listen, they, out of court, without telling their insurer, agreed to fund this litigation against the insurer and you should provide us coverage despite that. I see him into my... Just one quick question. It's a little out of left field. Was there a subrogation right? In other words, if Curtis Park had paid, could Allied have gone against the general and the subs? I think that the CLOSAD agreement makes that very... Without that. In some ways, they're attempting to prevent that because Curtis Park is saying, we will hold you harmless no matter what. That's why I'm asking. Was there a subrogation right? I think there ought to be a subrogation right. There was no subrogation action proposed just because of the way that the claim was denied. Okay, thank you. Is there anything in the policy about subrogation? There are rights in the policy regarding subrogation. What I can tell you is the clearest prohibition in the policy is that it cannot be signed without Allied World's permission. And of course, they're arguing that they did assign it to Mildred White and that's incorrect. If I can, I will address that. Thank you. May it please the court. Andrew Guthrie for Curtis Park, the insured. This is effectively a single issue appeal on the merits. I know we talked about a lot of claims there. I want to touch on why there's no circumstances where a complete retrial is appropriate. But the issue that has been raised on the merits in this appeal is set aside all those jury findings. It's one question. Did the district court properly allow Curtis Park to recover the $1.5 million in hard costs that the jury awarded? Right. Curtis Park didn't suffer any loss. It didn't. With this verdict, let's ignore the soft costs and say that's covered. The hard costs, Curtis Park is making money on the insurance policy. There's no insurable interest. It's getting back more. It's in better shape with this extra money from the verdict on the hard costs than it was if everything had gone properly in this project. It's making money on the insurance policy. The insurance policy is supposed to make you whole. And when you start getting more than what you suffered as a loss, there's... What's the term for that? Do you know the term I'm thinking of? The opposing counsel has called it a windfall. Is that the term you're thinking of? It's not a windfall. No, it's an incentive to collusion and fraud. You're better off without it. Oh, I'm sorry. I don't remember the term. I'll think of it as soon as you walk in. I'll probably start talking and you'll think of it as soon as I say something you don't like. Can I push back on it? The basic principle is insurance companies make money on insurance policies by investing the money and so on. The insurer is not supposed to make money. It's made whole. And respectfully, Your Honor, that's exactly what's happening here because... I'll explain that. Absolutely. I'm glad to do that. So what is happening here is we have promised to pay Melinda White for their portion of the hard costs when we recover in this litigation. So we're not making money. They are going to get paid. How much money do you get out of this? We get the portion of the loss that relates to our soft costs, which we unquestionably incur. You get a fraction of the hard costs, don't you? We do not. We are going to pay, under the closeout agreement, it says we paid them 62% of the recoveries in this case. And that is linked up with the relative allocation of hard costs versus soft costs. Now, of course, the reason these numbers are bigger is because we've got bad faith damages, which multiplies by two. We essentially have a trebling of the damages. So you get 38% to follow up with Judge Hartz's question. You're going to get some of the hard costs. We are not going to get some of the hard costs because... What's the 38%? Excuse me, Your Honor. What is the 38% then? This was just the agreement that the parties reached in the closeout agreement to say, hey, we've got this lingering liability. And if I could, Your Honor, just take a step back. What does the policy cover? This is a broad policy... It covers the named insured. It covers the named insured. Curtis Park is the named insured. Curtis Park has brought this litigation as the named insured to recover its losses. For incurred losses. Incurred. That word matters. That's exactly right, Your Honor. And there's no dispute in this appeal that the term incurred has a broad, ordinary meaning that focuses on liability for the expense, not on paying for it. So you can incur losses without paying any money? Is that your bottom line? Absolutely. You can be liable for an expense. We cited case authorities that say if you're liable for the expense, you have incurred it whether you've paid it out of pocket. But there's testimony that Curtis Park can't be liable for the expense. I disagree with the characterization of that testimony. I'm grateful for the opportunity to address this. So the Jonathan Alpert testimony that you just talked about, when he said, no, we haven't paid it, that's undisputed. But this policy covers incurred liabilities, not what we've paid. But the agreement prevents that from happening. That's the whole purpose of the agreement is to make it clear that Curtis Park isn't going to have to pay. We are going to have to pay it. As soon as we recover from insurance, we are going to pay them their portion of the proceeds. That is a liability. Well, if we disagree with you on that point, which I think there's some skepticism, do you lose? If you disagree with us on which point? On whether we've incurred liabilities? Incurred losses. No, because the policy is broad enough to cover. I mean, the way it's written, right, it talks about physical loss or damage to our covered buildings, right? And it says we will value that coverage based on replacement costs. That is the costs of materials and labor incurred to repair or replace the damage. Now, that policy language. Did the district court read the policy functionally to say, in fact, Millinder is an additional insurer, even though that's not what the policy agreed to? No, I think the court said over and over and over again that this argument, the argument that Allie Burrell is raising here, does not prevent the fact that Curtis Park incurred the loss. The court understood the broad policy that we're talking about here, which is that we have liability. Look, we have liability under the construction agreement. We lay this out in our brief. And it says specifically, and I want to talk about some of what Mr. Yarger talked about, the construction agreement, look at section 7.7.5. The overall structure of the agreement says, yes, Millinder White fronts the costs. It's the general contractor. But then we as the owner, it is our obligation to reimburse Millinder White for the costs of the performance of the project. And section 7.7.5 speaks to this issue specifically. And it says that Curtis Park must pay Millinder White the costs of repairing or correcting damaged or non-conforming work. You've been asked this question before, or at least your client has. What is the case that is like this one that agrees with your position? Is there one? What's your best case? West End Harbor. And so in West End Harbor, the owner of an apartment building was seeking to recover flood insurance for costs that its contractors had fronted. The owner had not yet paid out of pocket. There was even a signing agreement that said, we will go and pursue insurance, and then we will pay you, the contractor, once we've recovered from insurance. Now, that was an even more strict insurance policy that only covered the amounts the insured had actually spent. But the federal court in that case said, it's fine. Because the policy language is broad enough to cover liabilities that you incurred to do the repairs, even if the money has not yet flowed from the insured to the contractor. Because what the court said is, if we interpret this policy any differently, that would preclude repair services on credit, and that result would be untenable. That's what the court held in West End Harbor. We have a broader policy language here, right? That was one of the amounts you actually spent. How did the parties reach the percentage split? And why did it cover all recovery, which would include hard costs and soft costs? You know, I don't know if there's testimony that breaks that down. I think there's testimony that says the 6238 roughly went to, what is the amount of hard costs that Melinda White had fronted, and had this sort of lingering liability for, versus what was the amount of the soft costs that we as Curtis Park had paid out of pocket. Describe the hard costs again. The costs that Melinda White had fronted. Had fronted. And yet Melinda White, if for some reason the insurance policy lawsuit lost, maybe because of bad faith, because of whatever, Melinda White would not get anything back. Your Honor, that's the arrangement the parties reached. I think what the testimony is, is when we get to the end of a big project like this, they the general contractor, we the owner, we're going to have a lot of open issues, open obligations and liabilities to one another. And so what they said at that point was, all right, we're going to resolve this in the closeout agreement. And through the closeout agreement, Curtis Park, you're going to pay Melinda White a check. Melinda White is going to get, rather than getting this direct reimbursement for the hard costs that they had fronted, and under the plain terms of the construction agreement, we're owed reimbursement. What Melinda White said was, okay, rather than this direct reimbursement, we're going to get a contingent payment right under the insurance claim. Now, Your Honor should reference this. Melinda White is going to get paid more than just the hard costs that it paid out of pocket. It gets 62% of the recovery. And so I don't know that there's testimony to this effect, but clearly that was a business decision that Melinda White reached and said, we have this liability. We're going to accept a contingent payment obligation in order to satisfy that. How were the soft costs calculated by the jury? What was the evidence on which the soft costs were based? So that's Joint Exhibit 42, I believe, in our supplemental appendix. There was an outline of the soft costs of the things that we, Curtis Park, had lost. So this is additional taxes. It's marketing expenses. It's lost lease revenue. There's testimony from Jonathan Alpert that laid that out. The jury gave us what we asked for. And there's been no dispute on appeal that we incurred those soft costs. That Curtis Park did? We, Curtis Park, included. Did Melinda White incur any costs that were included in that calculation? Not in the soft costs, Your Honor, no. The only evidence that Melinda White, what they fronted, what they paid in the hard costs is the $2.8 million. And you referenced this all phase issue. The testimony is Melinda White paid out the $2.8 million, and it was the last $400,000 that it withheld from its construction from all phase because they had this lingering liability sort of much in the same way that we do. But let me say, to give you some comfort or make your life easier, you can set aside every dollar of the all phase issue. We have $2.8 million in hard costs. Set aside all $1.1 million. We've still got $1.7 million in hard costs that Curtis Park unquestionably incurred. The jury awarded 1.5. And so you can set the all phase issue aside. Let me clarify. His claim that we represented, that we paid the hard costs in the sworn proof of loss, you can go back and look at that exhibit. It will not say that. It's a very general document that just says, here are our hard costs. And again, it goes back to this sort of, I don't want to call it a slight of hand, but they talk in their brief, they talk today. What are the amounts you, Curtis Park, paid? That's not what the policy is asking. The policy asks, what are the liabilities we incurred? And under the construction agreement and then under the closeout agreement, we incurred liability for the hard costs. So you're distinguishing between a liability and a loss? Not at all, Your Honor. Well, you keep saying liability instead of loss. So, Your Honor, loss is not defined in this policy. The policy says, we will pay your loss, but it doesn't define what loss means. Well, what does loss mean to you? It's a general, it gets its ordinary meaning under insurance law. This is, you know, the property you've been deprived of, the damage you've suffered under the insurance policy. So we look at the scope of the policy. And the scope of the policy is physical loss and damage to our covered buildings in the course of construction as valued by replacement costs. So, is it the same place as if the general contractors, subcontractors, had been additional insurers? Yeah, we'd probably get to the same place. So the district court's modifying the policy. It's not because Curtis Park is bringing the lawsuit as a named insurer. So what the additional insurer provision says is, okay, you contractor, if for whatever reason you don't recover, you can sue the insurance company. And that's what all the case authorities say. There are cases where these third-party contractors weren't named as an additional insurer and they got the claim. That's not what this is. This is Curtis Park suing as a named insurer to recover its losses just as is allowed in the broad language of this insurance policy. What is argued is a loss is not just the amount they've paid, but the amount that they're liable for. That's right. Given the closeout agreement, doesn't that establish that Curtis Park will never have to pay another penny? It's not liable for anything after that agreement is executed. Your Honor, it is liable for paying 62% of the judgment that we recover from now on. But there's no way it's going to be out any money. But that's the point of insurance. The point of insurance is when my property is damaged, I've got an insurance policy, so the insurance company pays to repair that damage, and that's what Allied Gold promised to do. But it promised to pay whatever you're out. If for whatever reason the people that Curtis Park might have owed have agreed not to ask for any of that money, not to seek any of that money, then there's no loss by Curtis Park, and Curtis Park has benefited. I wish I could remember the term that escaped me. I should have written it down. Your Honor, I would just say we have a liability to pay. It is under the closeout agreement. You have a liability to pay. There's no way you're going to be any worse off because of that agreement. Curtis Park is not going to have to pay anybody anything. And, Your Honor, I see my time is up. Can I answer your question? Oh, yes. That is exactly what would have happened if they had come to this property and acknowledged coverage, had written us a check, we would have immediately paid Malinder-White. We would not have been any worse off. That's the reason why we have insurance, is so that we as the insurer could better off. Under the scenario where the insurance company pays for the damage and then we pay Malinder-White, we would have been net zero. That's exactly right. And that's what we're trying to get to, is net zero. Plus the bad faith damages, Your Honor. That's the only difference. But the point is, the cost that Malinder-White paid up front, we are going to pay them when we recover from insurance. And that's no different from just thousands of other... I mean, think about a homeowner's claim, where if I have roof damage at my house and somebody comes out and fixes it, I'm going to say, okay, yeah, do that work, and I'll pay you when the insurance check comes. Me as the homeowner, I'm not any worse off. I'm not any better off. I have paid for the roof damage that the insurance company said it would cover. And that's what happened here. And so for all those reasons, we'd ask you to... Can I just jump in there? But the homeowner, doesn't the homeowner have to contact the insurance company and the insurance company sends out an adjuster to look at the damages? I mean, isn't the point that you have deprived the insurance company of their ability to assess the damages of the amount by a private agreement? Well, Judge Ida, if I can continue your question, I mean, they had the opportunity to come out. They had the opportunity to come out and investigate all the damage. I know, but they didn't... They weren't party to the agreement, right? The closeout agreement, yes. Right, they weren't party. So I guess that's my question. How is that not something that you're gaining? Because we are liable for the cost and what the insurance company... Right, but the amount of the cost and the assessment of the cost. Oh, got it. Excuse me. I'll let you finish your question. No, no, no. The amount of the cost, they had four years to test those things. They saw all of the invoices. So if you can go back and look at the claim summary document in our appellate appendix that's joint exhibit 24, there's pages and pages laying out. This is the repair work we did to fix the concrete slab, to fix the building. Here's an itemization of all the expenses. That adds up to the $2.8 million. The insurance company had every opportunity to test those numbers, and it tested those numbers in front of the jury. It said that none of them are covered because this was faulty workmanship. The jury heard all that evidence, rejected it, found there was no contractor fault. So all of those costs, the $2.8 million, the jury found that those were covered by the terms of the policy. The only issue we're still talking about is is there somehow some difference that we as the insured cannot recover for those costs simply because we didn't pay out of pocket, but we're simply liable for it. The district court properly found we could recover, and we ask you to affirm. Thank you, counsel. Thank you. Counsel, you'll have some extra time. I'd like you first to respond to their reliance on West End. How do you distinguish West End? Yes, Your Honor, very easily. In West End Harbor, there were two very key points that distinguish this case fully, that case fully from this one. The contractors issued invoices to the building owner. Not only that, the contractors took out liens on the property. Even then, the court said, well, there's still a fact issue here. I'm not going to decide it in favor of one party or the other. It goes to the fact finder. Here, we have no invoices. Of course not. We have the opposite. We have a formal notice under the contract whereby Curtis Park tells the owner, wait, you're going to fix this. You're going to pay for all costs. And they're making this new argument, two new arguments on appeal that show up for the first time in the response brief. First is West End Harbor and the notion that this is a repair on credit agreement. This is not a repair on credit agreement. As you pointed out, Judge Harris, there is no obligation to pay back the hard costs at any point. Imagine this. Imagine we went to trial and the jury found only soft costs are recoverable, no hard costs. Curtis Park would still be apparently paying Millinder-White two-thirds of the recovery. That's a windfall to Millinder-White who's not insured under this agreement. And it's not recovering the hard costs if it was a $0 recovery. Curtis Park would owe nothing to Millinder-White or those subcontractors. The next thing they're arguing is this brand new argument under the construction agreement. And they focus on 7.7.5. What they don't tell you is a couple pages further in 12.12.1, in order for Millinder-White to bill Curtis Park for amounts owed, Millinder-White has to send what is called a, quote, formal application for payment, showing in complete detail all monies paid out or costs incurred by the contractor, Millinder-White, for which the contractor is to be reimbursed under the terms of the contract documents. That's not just a formal documentation requirement. It is the obligation by which Millinder-White says, you have to pay me for this. We don't have that document because there is no obligation for Curtis Park to pay the hard costs. It's sort of like a lawyer's engagement agreement. Someone hires me, we set out the scope of work and my hourly rate, but until I invoice that client, they don't owe me a dime. The same is true here under the construction agreement, and they completely ignore that provision. On the closeout agreement, what they are saying is that the obligation to pay the judgment of this lawsuit somehow supports the claim that they filed years ago. The closeout agreement wasn't submitted as proof or approved. The claim didn't even exist when the claim existed. The only document that we have that existed at the time that this insurance claim was filed was that formal notice saying, Millinder-White, you have to pay for this, and they didn't tell us about that. They didn't give us that document during the claim process, nor did they tell us that the subcontractors were going to be paying for these costs, nor did they tell us about the closeout agreement. There is a very significant misrepresentation issue in this case that we were never allowed to pursue because the district court fundamentally misunderstood the scope of this policy. I think the final point I want to make is that the point of insurance is not what Mr. Guthrie said. The point of insurance is to cover specific losses pursuant to an agreement for premiums paid. Millinder-White never paid premiums, neither did subcontractors. If your home gets damaged and someone else agrees to pay for it without charge, you don't go to your homeowner's insurance and ask for money from the homeowner's insurance. What you certainly don't do is go to the person who fixed your house and say, let's team up and sue the insurance company and split the proceeds after the fact. As you said, Judge Hartz, that's an invitation to collusion and fraud. It's not an invitation to correctly construing an insurance policy that covers demeaned insurance losses. Before you get to your last point, did the jury find that there was no defective construction causing the need to repair? It found that that exclusion did not apply. It was our burden. The exclusion? The exclusion for defective work. Okay. But keep in mind, every time we told the jury or tried to tell the jury, Milner-White is paying for these losses and so are the subcontractors. The judge jumped in and said, don't worry about that. Forget about it. What's the very best evidence that we have that there was defective construction here? The fact that the contractor agreed to pay for it and the contractor went to its subs and said, not only are we not paying for it, you're paying for it. Well, did you? Let me just ask you.  Was there expert testimony? There was. That you presented showing that this was defective construction, but the jury didn't buy that? That's correct. On a skewed record, and again, they were not allowed to consider our misrepresentation defense would have washed all that away. The other thing they weren't allowed to consider is their expert who professed an inability to figure out what actually caused this slab to crack, even though it's very clear that the reinforcement within the structure wasn't placed in the right location. We weren't allowed to tell the jury the story, well, now wait a minute. Milner-White is paying half the cost of his lawsuits. And Milner-White is the one who wants to claim that it can't figure out what happened, even though it's paying for the deflected slab and the cost of repair. So even though there was expert testimony on that point, the jury didn't fully understand and was not allowed to, and the judge told them to ignore the significance of the fact that the contractor here, who you typically think would be at fault, was being told it doesn't matter that they covered the cost. You can ignore that. I'm telling you as a matter of factuary, ignore that piece of evidence. And that was a very significant problem in the presentation of this case, and that doesn't even get into the misrepresentation defense that we had that we were allowed to submit. Oh, and last point on that misrepresentation defense, I want to make this clear. Curtis Park represented in his sworn statement of loss that it, quote, engaged in no attempt to deceive the insurance company as to the extent of said loss has in any manner been made. We had a right to prove that they did misrepresent the extent of the loss because Milner-White paid for it. They don't have insurance. And their sons paid for it. They don't have insurance. So we should have been allowed to present that misrepresentation defense to this jury. Do you have a question, Judge Milner? I think he does. Thank you. Interesting. Case is submitted. Counselor excused. We're going to take a brief recess at this time. Court is in recess.